Ella JACKSON, Individually, and Ethelene Johnson, Individually and as Next Friend of Willie Mae Johnson, a Minor, Appellants,

v.

The CITY OF DALLAS, a Municipal Corporation, and Dallas Transit System, Appellees.

No. 17313.

Court of Civil Appeals of Texas.

Dallas.

June 27, 1969.

Rehearing Denied July 25, 1969.

Jay S. Fichtner, Berman & Fichtner, Dallas, for appellants.

James H. Holmes, III and Robert E. Burns, Burford, Ryburn & Ford, Dallas, for appellees.

CLAUDE WILLIAMS, Justice.

Appeal from a take nothing judgment rendered *non obstante veredicto.*

On December 18; 1965 M. C. Johnson was riding as a passenger on a bus owned and operated by the Dallas Transit System, a department of the City of Dallas, when he was shot and killed by Claudell Banks, another passenger. Ella Jackson, the widowed mother of the deceased, and Ethelene Johnson, the widow, individually, and as next friend of Willie Mae Johnson, the minor daughter of the deceased, brought this action against the City of Dallas and Dallas Transit System, and also Claudell Banks, seeking to recover damages pursuant to the provisions of the wrongful death statutes of the State of Texas (Articles 4671–4678, Vernon's Annotated Civil Statutes of Texas). It was alleged that Wilburn McDonald, the driver

of the bus in question, acting within the course and scope of his employment for the transit system, was negligent in permitting Claudell Banks to enter the bus while intoxicated and carrying a gun and was also negligent in failing to eject Banks from the bus when he knew or should have known that Banks' presence endangered the safety of other passengers; that such negligence was a proximate cause of Johnson's death.

The case was tried to the court and a jury. The court's charge to the jury contained an instruction to the effect that as a carrier of passengers the transit system was under a duty to exercise such a high degree of foresight as to possible dangers and such a high degree of prudence in guarding against them as would be used by a very cautious, prudent and competent man under the same or similar circumstances, and that the term "negligence", as used in the special issues in the charge, meant a failure, if any, to exercise a high degree of care. The court charged the jury that the term "proximate cause" meant that cause which in its natural and continuous sequence produces a result that would not have occurred but for such cause, and which result, or some like result, ought reasonably to have been anticipated or foreseen by a very competent, cautious and prudent person in the light of attending circumstances.

In response to the special issues submitted the jury found (1) that at the time he entered the bus Claudell Banks was intoxicated; (1–A) that Wilburn McDonald knew, or should have known, that Banks was intoxicated when he entered the bus; (2) that McDonald allowed Banks to board the bus knowing that Banks was intoxicated; (3) that such act and conduct was negligence; (4) that such negligence was a proximate cause of the "occurrence in question"; (5) that at the time Banks entered the bus McDonald knew that Banks carried a gun; (6) that McDonald allowed Banks to board the bus knowing that Banks carried a gun; (7)

that such conduct was negligence and (8) was the proximate cause of the "occurrence in question". The remaining issues (9 and 10) dealt with the amount of damages found by the jury.

The city and transit system filed their motion for judgment *non obstante veredicto* in which it was contended that the court should set aside and disregard the jury findings of negligence and proximate cause because there was no evidence of probative force to support such findings. The trial court sustained this motion and rendered judgment denying plaintiffs any relief against the City of Dallas and Dallas Transit System. The court rendered judgment for plaintiffs against Claudell Banks who did not contest the action and who does not now appeal from the judgment.

Appellants have perfected their appeal and bring forward ten points of error. Points 1 and 10 relate to alleged procedural errors. Points 2–5, inclusive, advance the contention that the trial court was in error in granting appellees' motion for judgment *non obstante veredicto* and that the judgment should be reversed and rendered upon the verdict. By their points 6–9, inclusive, appellants seek to reverse and remand the trial court's judgment because of the refusal of the court to submit to the jury certain special issues requested by appellants relating to the alleged negligence of the bus driver in failing to take some action to protect the passengers prior to the shooting.

 We first consider appellants' procedural points. They argue, in point 1, that the court should not have granted appellees' motion for judgment *non obstante veredicto* because such motion was too general to meet the requirements of Rule 268, Vernon's Texas Rules of Civil Procedure. Rule 268, T.R.C.P., provides: "A motion for directed verdict shall state the specific grounds therefor." Rule 301, T.R.C.P., provides, inter alia, that "upon motion and reasonable notice the

court may render judgment non obstante veredicto if a directed verdict would have been proper, * * *." Appellants point to the motion for instructed verdict filed by appellees wherein it is generally stated that "there is no evidence of any negligence attributable to these defendants" and: "If there be evidence of negligence attributable to these defendants, such evidence as a matter of law was not a proximate cause of the accident in question." Accordingly, they contend that such motion is too general to direct the court's attention to the specific contention advanced. We do not agree with appellants and overrule point 1. It is not necessary to actually file a motion for instructed verdict as a prerequisite for the court considering and passing upon a motion for judgment *non obstante veredicto*. Rule 301 merely provides that such judgment *non obstante veredicto* may be rendered "if a directed verdict would have been proper." McDonald, Texas Civil Practice, Vol. 4, page 1413. Moreover, we have carefully examined the motion for judgment *non obstante veredicto* filed by appellees and find that the same is specific and detailed in presenting the question of "no evidence" as to the issues complained about. In fact, appellants do not challenge the sufficiency of the motion for judgment *non obstante veredicto* itself and certainly there would be no basis for such challenge.

■ By their point 10 appellants charge that the court erred in failing to permit them to file their second trial amendment. After the conclusion of the evidence and while the charge of the court was being prepared appellants offered a second trial amendment which charged that the bus driver was negligent in leaving the bus and abandoning his passengers on the occasion in question and that such negligence was a proximate cause of the death of Johnson. We do not find reversible error reflected in this point. The trial court, by virtue of Rule 66, T.R.C.P., is vested with broad discretion in determining whether or not to grant leave to file a trial amendment. We find no evidence of abuse of discretion, especially as appellants made no motion to withdraw their announcement of ready following refusal to allow the amendment to be filed. Point 10 is overruled. Sinclair Houston Federal Credit Union v. Hendricks, 268 S.W.2d 290 (Tex.Civ.App., Galveston 1954); Robertson v. Southwestern Bell Telephone Co., 403 S.W.2d 459 (Tex.Civ.App., Tyler 1966); and Tanenbaum Textile Co. v. Sidran, 423 S.W.2d 635 (Tex.Civ.App., Dallas 1967, writ ref'd n. r. e.).

Appellants' points 2 and 3 assail the trial court's action in granting appellees' motion for judgment *non obstante veredicto* and in doing so setting aside the jury's answers to Special Issues Nos. 1-8, inclusive. These issues are basically: (1) Was the bus driver negligent in allowing Banks to enter the bus on the occasion in question knowing that he was intoxicated; if so, was such negligence a proximate cause of the shooting. And (2) did the bus driver know that Banks carried a gun when he entered the bus and, if so, was his act in permitting him to get on the bus with the gun negligence as well as a proximate cause of the shooting.

■ It is fundamental that in order for us to sustain the action of the trial court in granting the motion for judgment *non obstante veredicto* we must determine that the record contains no evidence of probative force to sustain the jury's answers to the issues relating to negligence and proximate cause. It has been said that the term "no evidence" does not mean literally no evidence at all. "No evidence" comprehends those situations wherein by the application of established principles of law the evidence is deemed legally insufficient to establish an asserted proposition of fact. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Kirkpatrick v. Raggio, 319 S.W.2d 362 (Tex.Civ.App., Fort Worth 1958, writ ref'd n. r. e.); Hill v. W. E. Brittain, Inc., 405 S.W.2d 803 (Tex.Civ.App., Fort Worth 1966). A

jury verdict may not legally be supported on surmise, speculation or suspicion. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898). In our judicial review of the propriety of the trial court's action in sustaining the motion, all testimony must be considered in a light most favorable to appellants against whom the motion was granted, and every reasonable intendment deducible from the evidence is to be indulged in such parties' favor. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952). The question thus presented is one of law: Was the evidence adduced by the appellants legally sufficient to prove negligence on the part of appellees' bus driver which was a proximate cause of the shooting which resulted in Johnson's death?

To resolve this question of law requires a review of the relevant testimony, which may be summarized as follows:

Lester Manning, appellants' first witness, related by marriage to M. C. Johnson, testified that he and Johnson boarded the bus on the afternoon of December 18, 1965; that Johnson sat down on the left side of the bus several seats behind the driver and he, Manning, sat down in the seat behind Johnson. There were a number of other passengers on the bus. After the bus had proceeded several blocks he remembered Claudell Banks getting on the bus. He said he looked at Banks as he got on the bus; that there was a lady in front of Banks and as he apparently attempted to pay his fare a quarter dropped on the floor of the bus and rolled toward the back. The bus driver asked Banks to pay his fare whereupon Banks responded that he wasn't going to pay anything else and thereupon he walked on back into the bus. He said the bus driver did not challenge Banks but proceeded to start the bus and drive off. As to Banks' appearance as he got on the bus Manning said:

"Q All right; did you notice anything unusual about him?

A Well, you could see, he had on a coat, and you could see he had a gun, a pistol, right inside of his belt.

Q What part of the pistol did you see?

A The handle part, it was right here (indicating).

Q Stand up so the jury can see what you are talking about.

A It was sticking right here (indicating). And he had a coat on and when he kind of raised his arm, the coat kind of flew aside, and everybody in the bus could have seen it had they been looking, they could have seen it."

Asked on cross-examination if he had told the bus driver that Banks had a gun he responded:

"A No, because the bus driver had already seen it.

Q You say he had seen it, you can't see out through his eyes, can you?

A But he seen it, though."

Concerning the intoxication of Banks, Manning testified:

"Q All right; and did you notice anything else about him, besides the gun?

A Well, he was intoxicated some kind of way, I don't know what he was drinking, but it was something, and he wasn't at himself because he was staggering all over the bus.

Q Did the driver say anything to him?

A Didn't say a thing, he just—

Q Did the bus driver—sir?

A Just kept driving.

Q He let him get on the bus?

A Yes."

As to what transpired after Banks got on the bus Manning testified:

"Q All right; what happened then, what did he do then?

A Well, he started moving back and forth on the bus from one side to another, left to right, and he wouldn't sit down like a normal person would, he kept moving.

Q Was he quiet?

A No, he was steady talking, he was just talking and cursing all at the same time.

Q When you say he was cursing, was he using vile language?

A Using vile language.

Q Was he whispering this vile language or—

A He was talking loud.

Q Were you able to hear him?

A You could hear him plain."

Again he testified:

"Q All right; what had he been doing in the bus prior to the Sanger stop?

A Well, he was talking and going back and forth all over the bus.

Q What did he say when he talked, say some of the words he said, if you remember them?

A Well, he was talking about that he would kill, the way he was talking he would kill anybody, anyone that messed with him, he said it doesn't matter.

Q Was he threatening people?

A Yes.

Q Who did he threaten?

A Well, he was talking to, oh everybody on the bus, like anyone say something to him, he say something smart back to them."

* * * * * *

"Did you ever see him do anything with the gun?

A Well, he had it out a couple of times, and he put it back inside his belt, but he mostly kept his hands on it all the time.

Q All right, what happened next?

A Well, after he stopped, well, the bus driver, he pulled off then and he didn't say anything else to him about it, and he pulled up to Corinth and stopped and got off and didn't say anything else to him, to anyone.

Q The bus driver didn't say anything to anybody?

A No, he just opened the door and got off the bus.

Q At Corinth Street?

A Corinth Street, and walked off.

Q All right, then what happened?

A Claudell say 'I'm going to shoot you.' And then walked off.

Q And how did he walk off?

A Well, he didn't walk off, but he backed toward the front of the bus and he pulled the gun.

Q Then what did he do?

A He shot and stuck his gun inside his belt and walked on off.

Q Who did he shoot?

A M. C. Johnson."

Prior to that Manning had testified that as Banks went back into the bus he pulled out the gun and pointed it at a woman across the aisle by the rear side of the door of the bus and then came back up the aisle and sat down in the seat beside him. He said Banks had the gun under his coat and stuck in his belt at that time. Again he stated that he did not tell the bus driver about the gun.

Manning testified:

"Q All right, well, what happened at Sanger?

A Well, the bus driver stopped his bus and he asked, he told him that he would have to cut out all the loud talking and cursing, and he told the bus driver 'That goes for you, too.'

Q All right; now, who told who, who told the bus driver 'That goes for you, too'?

A Claudell Banks told the driver of the bus, 'That goes for you, too.'

Q Well, now, did he said (sic) anything else to anybody else about 'That goes for you, too'?

A Well, yes."

\* \* \* \* \* \*

"Q And so when the bus driver stopped at Sanger, then Claudell Banks said what to him?

A Claudell Banks said 'That goes for you, too.' After he told him he would have to cut the loud cursing and talking out, all that noise, he said 'That goes for you, too.'

Q Well, was he talking in a loud tone of voice or a low tone of voice when he said that?

A Loud one.

Q All this period of time?

A All that period of time after he got on the bus."

\* \* \* \* \* \*

"Q Did the bus driver do anything to put Claudell Banks off the bus at any time?

A No, he didn't do anything, just told him, after he told him he had to be quiet, he didn't say anything else to him, didn't try to do anything to prevent all that happened.

Q Could you see, well, do you know whether there are any mirrors in the bus that the bus driver can look into?

A Well, he has a long mirror right in front of him, he could see all over the bus, and he was looking backwards but still kept driving, but he didn't do anything, he just kept driving, he didn't do anything to protect the peoples on the bus."

Lurlene Howard, a passenger on the bus, testified that she had gotten on the bus at the end of the line and was sitting on the right-hand side of the bus in about the third seat from the front. She recalled seeing Claudell Banks get on the bus when it stopped at Forest Avenue. She said:

"Q And did you notice anything about him when he got on the bus?

A Nothing but he had a gun in his belt.

Q He had a gun in his belt?

A Uh huh."

Again, on cross-examination, she testified that she saw that Claudell Banks had a gun when he got on the bus; that it was located in his belt. She said that at the time he got on the bus he was wearing what appeared to be a jacket and that it was open in the front. Concerning Banks' state of intoxication at the time he got on the bus she testified:

"Q Could you recognize anything, did he appear to be in good health, or how did he look to you?

A He appeared to be drunk or doped.

Q Drunk or doped?

A Uh huh."

She said that the bus driver did not do anything to keep him from getting on the bus nor did the bus driver ever do anything to put him off the bus after he became a passenger.

As to what transpired after Banks got on the bus she said that he made some remark to the driver of the bus and then walked on into the bus; that there was a kind of commotion in the back of the bus and that there was some loud talking. She further testified:

"Q Do you remember anything about the gun?

A No, no more than he was waving it there.

Q He was waving it around?

A Uh huh.

Q Is that what you remember?

A Uh huh.

Q Was he talking?

A He just said he was going to kill everybody on the bus.

Q Did the bus driver do anything?

A No, he kept driving."

Wilburn McDonald, the bus driver, testified that he did not observe anything out of the ordinary about Banks as he boarded the bus; that he did not see anything to indicate that he was intoxicated at that time; that he did not see a gun on the person of Banks and observed nothing which would indicate that Banks would cause trouble. He said Banks asked him for a transfer and as he leaned over him he did not smell anything on Banks to indicate he was drinking. After the bus had proceeded several blocks he heard two men in the back arguing and the argument got louder and he turned and asked them to quieten it down or they would have to get off the bus. At that time he did not see a gun on Banks' person. The argument continued and when he arrived at a filling station at Corinth Street he stopped his bus, opened the door and got off to go into the filling station to call the police to remove the people who were arguing. After he got off the bus and before he got to the filling station he heard a shot; that he

turned around and saw Banks getting off the bus and it was at this time that he, for the first time, saw that Banks had a pistol. He made no effort to go back into the bus at any time before he got off to go to the filling station and call the police.

It must be borne in mind that the trial court submitted the two basic liability issues which were limited solely to the posture of the case at the time Claudell Banks entered the bus. We are therefore now concerned only with the distinct and definitive point in time in the course of events that took place as Banks boarded the bus.

First, as to Special Issues 1–4, inclusive, concerning the drunken condition of Banks at the time he got on the bus, we are convinced that a careful review of the evidence reveals an entire absence of evidence of probative force which would justify the jury's answer as to negligence and proximate cause. There is a serious question whether the evidence is sufficient to support the answer that the bus driver knew, or should have known, that Banks was intoxicated when he entered the bus. The driver states that he saw and observed nothing unusual about Banks' actions and conduct as he entered the bus and that he did not smell anything on him as Banks leaned over and asked him for a transfer. Other witnesses' testimony that Banks was "drunk or doped" and "acted funny" may be said to justify the answer to the question of whether the driver "should have known" that Banks was intoxicated but, even so, such evidence, even when viewed in the most favorable light to appellants, wholly falls short of being of sufficient probative force to support the jury's answer that such action on the part of the driver in permitting Banks to become a passenger was negligence.

■ There is no evidence in this record of any unusual statement or conduct on the part of Banks prior to and at the time he entered the bus to indicate that he was loud, unruly or boisterous as a result of being intoxicated. Assuming, arguendo,

that Banks was intoxicated to some degree, such fact does not render him such a dangerous character as would demand that the bus driver reject him as a passenger. There is nothing in this record from which an inference could be drawn that Banks had belligerent tendencies; he did not shout, wave his arms, or outwardly give evidence of offensiveness that would lead even a very cautious, prudent and competent operator of a bus to believe that his admission to the bus would prove dangerous to other passengers. As is stated in 10 Tex.Jur.2d, Carriers, § 13, pp. 510–511:

"Intoxication is a ground for refusal if the intoxicated person is noisy and boisterous; in fact, any persons whose conduct or condition is such as to render acts of impropriety, rudeness, indecency, or disturbance reasonably probable may be refused passage. But a carrier may not refuse one who, although intoxicated, acts in an orderly manner and shows that he has the ability to provide for his own safety."

We conclude, therefore, and so hold, that there was no evidence of probative force to support the answer of the jury to Special Issue No. 3 and therefore the trial court was correct in setting such answer aside.

Assuming (without admitting) that we be incorrect in our holding, as a matter of law, that there is no evidence of probative force to support the issue of negligence, yet we find, from a review of the record as a whole, that the trial court was correct in setting aside the answer of the jury to Special Issue No. 4, dealing with the question of proximate cause of the "occurrence in question" because same is not supported by any evidence in this record. The trial court defined "proximate cause" as applied to the facts in this case, as quoted above, and which contains the element of foreseeability which is essential to establish the test. It is well settled in our jurisprudence that a carrier is responsible in this class of action only when its agents knew, or should have known, or have anticipated the improper conduct and could have prevented the same or any harmful results. Generally, a party committing a negligent act is not responsible for a consequence which is merely possible according to occasional experience; he is expected to foresee and is liable only for a consequence which is probable according to ordinary and usual experience. Southern Traction Co. v. Coley, 211 S.W. 265 (Tex.Civ.App., Austin 1919); Fuller v. Southwestern Greyhound Lines, Inc., 331 S.W.2d 455 (Tex.Civ.App., Austin 1960, writ ref'd n. r. e.); Kerrville Bus Co., Inc. v. Williams, 206 S.W.2d 262 (Tex.Civ.App., Galveston 1947); Dallas Railway & Terminal Co. v. Hendrix, 261 S.W.2d 610 (Tex.Civ.App., Dallas 1953).

In Galveston H. & S. A. Ry. Co. v. Long, 13 Tex.Civ.App. 664, 36 S.W. 485 (1896), the facts involved a passenger alleged to be drunk and carrying a gun. The court, in reversing a judgment in favor of the plaintiff, another passenger, stated:

"* * * the carrier will be held liable when, by the exercise of proper care, the acts of violence might have been foreseen and prevented. * * * There was nothing in the conduct of Townsend that would have justified the carrier in refusing him admittance to the car, or in ejecting him. * * * No human being could have foreseen what happened, or could have had any ground upon which to base an anticipation that such a result would follow the presence and intoxication of Townsend."

Again we point to the testimony in this case, pin-pointed to that period of time when Banks entered the bus, to demonstrate that there was nothing whatsoever concerning the acts and conduct of Banks which would cause a very competent, cautious and prudent person to foresee that Banks would cause trouble or injure anyone on the bus. Accordingly, we hold that there is a complete absence of evidence of probative force

to justify the answer of the jury to Special Issue No. 4 relating to proximate cause.

The second liability issue submitted by the court, Issue No. 5, was framed in such a manner as to inquire whether or not the bus driver knew Banks carried a gun when he entered the bus. This obviously means actual knowledge on the part of the driver. There is no evidence in this record that the bus driver had such actual knowledge that Banks possessed a gun when he entered the bus. The driver says he did not see or observe any gun. Other witnesses admitted that no one told the driver that Banks had a gun. One witness' statement that he saw the gun when Banks got on the bus and that anyone else on the bus should have seen the gun if he was looking amounts to nothing more than an inference, suspicion or surmise, which does not carry sufficient probative force to constitute valid testimony of the fact inquired about.

Even if it could be said that the driver knew that Banks possessed the pistol at the time he entered the bus (which fact has not been established) such would not be sufficient to justify the jury's answer to Special Issue No. 7 concerning negligence. It is undisputed in this record that Banks, if he had the gun on his person, carried it in his belt with only the handle showing. He did not take it out and wave it around or otherwise demonstrate it in a boisterous or unruly manner prior to the time he entered the bus. There would be nothing evident in this record to justify the conclusion that the mere possession of the weapon would justify the finding of negligence in permitting him to get on the bus under such circumstances.

Furthermore, for the reasons and in the light of the authorities hereinabove set forth, we are of the opinion, and so hold, that there is no evidence of probative force to justify the jury in answering Special Issue No. 8 that the bus driver's act in letting Banks on the bus knowing he had a gun was a proximate cause of the "occurrence in question". The element of foreseeability must be viewed in the light of the facts and circumstances existing and known to the bus driver at the time Banks got on the bus. These facts are entirely negative in giving rise to any reasonable foreseeable act or conduct on the part of Banks which reasonably could have resulted in danger or injury to fellow passengers.

Appellants' points 2 and 3 are overruled.

Appellants' points 4 and 5 relate to the court's action in setting aside the jury's answers to Special Issues 9 and 10, both dealing with the amount of damages, and in the light of our disposition of appellants' points 2 and 3 it becomes unnecessary that we pass upon or consider these points.

We turn now to a consideration of appellants' second group of principal points advanced and relating to the court's refusal to submit to the jury certain requested special issues. These points, 6–9, inclusive, complain of the trial court's refusal to submit to the jury issues relating to the negligence of the bus driver in failing to remove or eject Banks from the bus after he became a passenger thereon. Prior to the submission of the court's main charge to the jury the appellants, pursuant to the applicable rules, presented to the trial court a group of issues, as follows: (1) whether Banks threatened Johnson while on the bus; whether McDonald failed to restrain Banks from the threats; whether such failure to restrain was negligence and whether such negligence was a proximate cause of the shooting; (2) whether the bus system failed to eject Banks from the bus and, if so, whether such failure to eject him was negligence and proximate cause; (3) whether McDonald's failure to remove Banks from the bus was negligence and, if so, a proximate cause of the shooting of Johnson; and (4) whether McDonald abandoned his bus and passenger Johnson on the occasion in question and, if so, was such negligence a proximate cause of the shooting of Johnson. These issues were all refused by the court.

As pointed out in our discussion of appellants' points 2 and 3, the trial court limited the jury's consideration of the issues of liability to that specific time when Banks boarded the bus. No issue was submitted to the jury concerning appellants' theory that after Banks boarded the bus his acts and conduct were of such a nature as to give rise to a legal duty on the part of the transit system, and its bus operator, to take some steps to protect the passengers, especially Johnson, and either restrain or eject Banks from the bus.

Our review of these points is conducted under different rules than those regulating our consideration of appellants' points 2 and 3. Rule 279, T.R.C.P., provides that: "When the court submits a case upon special issues, he shall submit the controlling issues made by the written pleadings and the evidence, * * *." The right of the plaintiffs to have affirmative issues submitted must not be determined from the viewpoint of conditions as they appear after verdict is returned, but from the viewpoint of what the jury might have found from evidence if issues had been submitted to them. Furthermore, if there is any evidence of probative force to support the jury's answers to such requested issues same must be given by the court to the jury even though, on motion for new trial, the court may consider the answers of the jury to be contrary to the great weight and preponderance of the evidence and grant a new trial for such reason.

We find that the only pleadings that justify the submission of the requested special issue concerning the bus driver's act in abandoning the bus is contained in the appellants' second trial amendment which was refused by the court. We have above assigned reasons for the correctness of the trial court's action in such refusal and therefore we overrule appellants' point 9.

As to appellants' points 6, 7 and 8 we are of the opinion that there is sufficient probative evidence in this record, and

also proper pleadings, to support appellants' contention that the trial court should have submitted the requested issues concerning restraint, removal or ejectment of Banks from the bus.

The transit system was under legal duty and obligation to provide every reasonable safeguard for the protection of its passengers. As a public carrier of passengers it owed M. C. Johnson a high degree of care in transporting him to his destination. Whether the transit company fulfilled its legal duty and obligation to Johnson, under the facts and circumstances presented by this record, becomes an issue of fact for the jury. It is not for us, as a court, to determine what we would have done under the same facts and circumstances presented, but it is for the trier of facts to consider and answer these questions.

As stated in 14 Am.Jur.2d, Carriers, § 1068:

"If * * * it appears that a passenger is intoxicated and disorderly, and the employees of the carrier know or ought to know that he will be a menace to the safety of his fellow passengers, his admission by the carrier, or its failure to eject him or to guard him carefully, is sufficient ground of liability to support an action by a passenger who is thereafter assaulted by him.

"Generally the courts have held it is a question for the jury whether a carrier's employees, in the exercise of that degree of care required by law, ought to have foreseen and prevented, from the circumstances of the cases, an assault by an intoxicated passenger upon a fellow passenger."

In Pacific Greyhound Lines, Inc. v. Vermillion, 87 S.W.2d 312 (Tex.Civ.App., El Paso 1935, writ dism'd), the court announced the rule:

"In our opinion the testimony is sufficient to support the view that the

driver of the bus knew or should have known the negro had become intoxicated and was disorderly. It is a matter of common knowledge that some men in such condition are frequently dangerous and prone to acts of unprovoked violence. It was not necessary that the driver of the bus should have anticipated the negro would certainly assault a fellow passenger in order to show negligence on the part of the driver. He might reasonably have anticipated the intoxicated negro would cause trouble and have a fight with some of the other passengers. The evidence was sufficient to carry the case to the jury upon the issue of the driver's negligence."

See also Galveston, H. & S. A. Ry. Co. v. Bell, 110 Tex. 104, 216 S.W. 390 (1919); Kerrville Bus Co., Inc. v. Williams, 206 S.W.2d 262 (Tex.Civ.App., Galveston 1947, writ ref'd n. r. e.).

The testimony is in this record to the effect that after Banks became a passenger he acted in an unruly manner; that he was boisterous and talked loud; that he made loud threats; that he took out his pistol and waived it around; and that he threatened to shoot everyone on the bus. From the standpoint of the bus driver he testified that he heard a disturbance in the back; that he saw two men arguing and told them to quieten down. He said that he did not see a gun but considered it necessary to stop the bus, get off, and go to a filling station for the purpose of calling the police for assistance. If the jury believed the bus driver, and not the other witnesses, they would be justified in finding that the driver should have taken some steps to remove, eject, or at least restrain, an unruly passenger. If the jury believed the other passengers' testimony, and not that of the driver, whether they thought the bus driver should have taken some action to eject, remove or restrain Banks would be clearly within their province.

We think the trial court erred in refusing to submit to the jury the special

issues duly and timely requested by appellants as reflected in points 6, 7 and 8, and therefore sustain such points and reverse and remand the cause for another trial.

Reversed and remanded.