W. J. LANGLEY et al., Appellants,

v.

TEXAS BANK & TRUST COMPANY, Appellee.

No. 17428.

Court of Civil Appeals of Texas, Dallas.

May 1, 1970.

Rehearing Denied June 5, 1970.

Duncan Boeckman, Golden, Burrow, Potts & Boeckman, Linda N. Coffee, Palmer, Palmer & Burke, Dallas, for appellants.

Benjamin Raye Collier, Stigall, Maxfield & Collier, Dallas, for appellee.

DIXON, Chief Justice.

Appellants Dr. W. J. Langley and the brokerage firm of Weber, Hall, Cobb & Caudle, Inc. (the latter hereinafter called Weber, Hall), have appealed from a judgment *non obstante veredicto* in favor of Texas Bank & Trust Company of Dallas (hereinafter called the Bank) in the sum of $39,050.49 against Langley only and the further sum of $77,344.13 jointly and severally against Langley and Weber, Hall.

Weber, Hall filed a cross-action seeking judgment over against Langley and Weber, Hall's former employee, Leslie L. Stewart, in the event judgment should be rendered against Weber, Hall in favor of the Bank. The court denied recovery on the cross-action.

Langley obtained loans from the Bank and signed notes in these amounts and on these dates: for $63,000 on September 30, 1965; for $44,000 also on September 30, 1965; for $55,000 on October 25, 1965; and for $130,000 on December 13, 1965. The first two loans were secured by real estate, the third loan by oil property. There is a controversy about the security offered for the fourth loan—that of $130,000 on December 13, 1965. It was secured, or at least was supposed to be secured, by a pledge of 1900 shares of Collins Radio Company and 1000 shares of Trans-World Airlines.

Langley made substantial payments on the first three loans, which provided for installment payments, but he did not complete payment in full. He did not pay anything on the fourth loan, which was due in full on January 13, 1966.

The suit against Langley is for the balance alleged to be due on the four notes following Langley's bankruptcy. It is undisputed that he made many other loans and signed many notes, but only the four above described are involved in this case.

The suit against Weber, Hall is concerned only with the $130,000 loan. It is based on a letter typed on a letterhead of Weber, Hall and signed by Leslie Stewart, who at that time was a licensed stock broker's agent employed by Weber, Hall. The letter is with reference to the shares of stock in Collins Radio Company and Trans-World Airlines. The Bank alleges that it relied on the letter from Weber, Hall, otherwise it would not have made the $130,000 loan to Langley. We copy the letter in full:

"December 13, 1965

Mr. Newell Johnston
Texas Bank & Trust Company
Dallas, Texas

Dear Mr. Johnston:

This letter is to inform you that Dr. W. J. Langley owns 1000 shares of Trans World Airlines and 1900 shares of Collins Radio and has asked us to send these stocks to you. We will have these transferred into his name and send them to you as soon as we receive them from the transfer agent.

Please let me know if you need any additional information.

Sincerely,
/s/ Leslie L. Stewart
Leslie L. Stewart"

Langley filed a voluntary petition in bankruptcy on October 3, 1966. He received a discharge in bankruptcy on March 16, 1967. His only defense to appellee's suit is that, having been discharged in bankuptcy, he has been discharged from the payment of his debts, including that of the Bank.

In answer to Langley's asserted defense the Bank alleges that he obtained the loans in question through fraud in that he induced the Bank to make the loans by making a false financial statement, and also made false representations as to the purpose for which the proceeds of the $130,000 loan were to be used.

## JURY VERDICT AND JUDGMENT OF COURT

A jury returned a verdict favorable to Langley and Weber, Hall. Special Issue No. 1 inquired whether the jury found from a preponderance of the evidence that the financial statement delivered by Langley to the Bank was materially false. The jury answered, "It was not materially false."

Special Issue No. 4 inquired whether the jury found from a preponderance of the evidence that prior to the making of the $130,000 loan of December 13, 1965 Langley represented to the Bank that the proceeds of the loan would be used to develop mining properties and to purchase over-the-counter securities. The jury answered, "No".

Special Issue No. 8 inquired whether the jury found from a preponderance of the evidence that the Bank made the $130,000 loan of December 13, 1965 to Langley in reliance upon the letter of December 13, 1965 from Weber, Hall addressed to the Bank. The jury answered, "They did not rely."

Other issues were conditionally submitted, so were not answered.

Langley and Weber, Hall filed motions for judgment in their favor based on the jury verdict. Their motions were overruled. The Bank filed a motion for judgment *non obstante veredicto*. Its motion was sustained and a judgment signed September 9, 1969 was rendered against Langley and Weber, Hall as stated in the first paragraph of this opinion.

## IN RE LANGLEY'S APPEAL

Appellant W. J. Langley rests his appeal on six points of error. In substance they are as follows: (1) there was competent evidence to support the jury's answer to Special Issue No. 1, (2) and the answer to Special Issue No. 4; (3) there was no competent evidence that would have justified a jury finding favorable to appellee

to Special Issue No. 3, (4) or to Special Issues Nos. 6 and 7; (5) there was competent evidence that would have supported jury findings favorable to Langley in answer to Special Issues Nos. 2 and 3; and (6) there was competent evidence that would have supported jury findings favorable to Langley in answer to Special Issues Nos. 5, 6 and 7.*

Appellee Bank in counterpoints and cross-points vigorously contests appellant's contentions. The Bank insists that the evidence shows as a matter of law that Langley's financial statement was materially false. In the alternative the Bank presents several cross-points and prays that if the court's judgment or any part thereof should be reversed the judgment not be rendered in favor of Langley, but the cause be remanded for another trial.

■ There are well established legal principles which must guide us in determining whether to affirm a judgment *non obstante veredicto*. To sustain the trial court's judgment we must be able to hold correctly that the evidence did not justify submission of issues to the jury; we must view the evidence in the light most favorable to the appealing party; conflicting conclusions and inferences must be resolved in favor of the jury's answers; the evidence must be so strong that reasonable men could draw but one conclusion: that the judgment *non obstante veredicto* was correct. Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273 (1958); Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952); Jackson v. City of Dallas, 443 S.W.2d 771, 776 (Tex.Civ.App., Dallas 1969, rev. on other grounds, Tex., 450 S.W.2d 62); Billingsley v. Southern Pacific Company, 400 S.W.2d 789 (Tex.Civ.App., Tyler 1966, writ ref'd n. r. e.); McCormick & Ray, "Texas

Law of Evidence", 2nd Ed., Vol. 1, Sec. 44, pp. 42–43; 57 Tex.Jur.2d 311.

■ The Statement of Facts in this case is voluminous, consisting of 410 pages of testimony and 61 documentary exhibits. We have examined the record and have concluded that the judgment *non obstante veredicto* cannot be sustained, for there is some evidence in support of the jury's answers to Special Issues Nos. 1 and 4. However we are of the opinion that said answers are so contrary to the overwhelming weight and preponderance of the evidence as to be manifesty wrong. Consequently we shall not reverse the trial court's judgment and render judgment in favor of Langley, but shall reverse the judgment in favor of the Bank and remand the cause as to Langley for another trial.

In the financial statement in question, dated April 30, 1965, Langley shows assets of $1,509,166 and liabilities of $168,000, leaving a net worth of $1,341,166. Among the assets Langley lists a corporation named Summit Diversified, wholly owned by him, which he values at $416,666, and a corporation named Arizona Copper, also wholly owned by him, valued at $300,000. Langley is a medical doctor. He lists his income in 1964 from the practice of medicine as $114,254.31. The assets of Summit Diversified were supposed to consist of undeveloped gold and copper mines in the Republic of Mexico. The assets of Arizona Copper were supposed to consist of copper mines in Arizona, also undeveloped for the most part. The undisputed evidence adduced at the trial shows that neither of the corporations nor the mines in Mexico and Arizona had been in production.

The Bank attacks as false the statement that Summit Diversified had a value of $416,666 and Arizona Copper had a value of $300,000.

---

* Special Issues Nos. 2, 3, 5, 6 and 7 were conditionally submitted and in view of the jury's negative answers to Special Issues Nos. 1 and 4 were not reached for answers by the jury. We take it that Langley, by his points of error Nos. (3), (4),

(5) and (6) means to say that even if the jury had made affirmative answers to Issues Nos. 1 and 4 it would have had to answer Issues Nos. 2, 3, 5, 6 and 7 in the negative—that is, favorable to Langley.

Langley testified that the financial statement of April 30, 1965 represented a "true and correct" statement of his assets and liabilities. He says the $1,341,166 net worth shown was correct as of the date the statement was made, also the date it was delivered to the Bank "to the best of my ability to ascertain that, although I considered this as a conservative statement at the time." He further says that he actually felt that his financial worth was considerably more than reflected on the statement. It was on the basis of the appraisals he had.

The Arizona and Mexico mining properties were sold to Langley for about $50,000 through Roger Harrold, a promoter living in Arizona. Harrold sent Langley a document "prepared for W. J. Langley" and signed by Ira W. Wagnon, "Consulting Engineer, Casa Grande, Arizona." We quote from this document:

"I examined 1,000 feet of cores from 4 separate holes, and found evidence of copper, gold and silver and molybdenum."

"This property originally sold for $600,000.00, with $10,000,000.00 Royalty to be paid out of earnings. It is my opinion this property could be worth millions of dollars, as evidenced by my sampling of cores and observations. However, much core drilling is needed to prove reserves."

Wagnon also prepared a document for Langley in regard to the property in the Republic of Mexico. We quote from that document:

"I have examined the La Colorada property; also Las Palomas, located in the Republic of Mexico, State of Sonora."

"Free gold can be observed in the ore, as well as considerable placer, as evidenced by the operation of gold pan, now in operation. It is my opinion considerable work is needed on this property and if carried out properly, could make a good rich gold mine. There is simply not enough work done to warrant an estimate as to dollars on this property."

As to the purpose of the loan of $130,000 on December 13, 1965 Langley testified as follows:

"Q Doctor, in the loan of December 13th, did you discuss with Newell Johnston the purposes for the loan, your purpose in requesting the loan?

A I have already answered that, but we had general discussion on several matters, one was developing the Arizona property which we did do partly, and I don't remember—we drilled four core holes there and I don't even remember the time element involved in that, but the funds went in that direction and some went to Mexico, but the intervals and the times and dates I don't recall."

Langley also testified that he told Johnston Summit Diversified was a corporation formed to hold his mining properties in the Republic of Mexico.

The above and other evidence which could be referred to and quoted have persuaded us that there was some evidence in support of the jury's answers to Special Issues Nos. 1 and 4; therefore the court was obliged to submit the issues.

However a careful study of the material evidence convinces us that the evidence was insufficient to support the jury's answers to Special Issues Nos. 1 and 4, therefore the judgment cannot be reversed and rendered in favor of Langley. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 Tex.L.Rev. 361.

Langley's testimony is replete with such negative statements as "I don't recall" and "I don't know"; and such qualifying statements as "I was under the impression that * * *", "I guess * * *", "I understood * * *", "I'm not positive * *", etc.

As to whether any properties were actually transferred to his holding corporation, Arizona Copper, Langley testified:

"Q What was Arizona Copper?

A That was the lode claims that we previously introduced here as evidence.

Q It's listed, sir, under corporations.

\* \* \* \* \* \*

Q Did you hire an attorney or did you try to incorporate this yourself?

A I was under the impression that this had been incorporated, but—

\* \* \* \* \* \*

Q Do you know whether or not such a corporation was ever formed?

A I can't—I just don't recall the actuality that I have the document on it, no, sir.

Q And I assume it would follow that you wouldn't know whether these properties were ever transferred to a corporation?

A No, sir, I don't.

Q Dr. Langley, what happened to these Arizona mining claims, if you know; do you still own them?

A Not to my knowledge, I don't.

\* \* \* \* \* \*

Q Why did you assign them to Newman and Pickering?

A At their request.

\* \* \* \* \* \*

Q It was in payment of a fee which you owed; is that right?

A I suppose so. \* \* \*

Q Approximately how much did you owe them at that time?

A I have no idea. \* \* \*

Q It would have been less than $10,-000.00, though, would it not?

A I would assume so.

\* \* \* \* \* \*

Q Now the Arizona properties, Doctor, were not actually producing properties at the time you prepared this financial statement, were they? In other words, there was no mining going on, bringing out copper ore and being sold to companies?

A No, sir, not of any consequence.

Q It was subject to having the value proven by taking cores and determining what the copper was, what it was worth?

A Yes, sir.

Q And it was subject to being developed?

A Yes, sir.

Q It was analogous to a wildcat oil well?"

As to Summit Diversified and the mining properties in Mexico Langley testified:

"Q All right, sir. What is the next item shown there?

A Summit Diversified.

Q And you have listed there that it was a private holding company; is that correct?

A Right. \* \* \*

Q And what is the value you ascribed to Summit Diversified?

A $416,666.00.

\* \* \* \* \* \*

Q Doctor, you never signed any instrument of conveyance conveying any properties to Summit Diversified, did you?

A Not that I recall, no, sir.

\* \* \* \* \* \*

Q The properties in Mexico, what happened to those? I notice they are not listed in the bankruptcy schedule.

\* \* \* \* \* \*

A I don't know what happened to Mexico. \* \* \*

Q So you don't know what happened?

A No, sir, I don't."

At the time the financial statement was made he had only a 10 per cent interest in the Mexico property. He obtained a 30 per cent interest in the Arizona property from Roger Harrold, but he immediately reconveyed 30 per cent of his 30 per cent back to Harrold.

When Langley submitted his schedules with his bankruptcy petition in 1966 he did not list either of the holding corporations. He did not list the Mexico property at all. He valued the Arizona property at $50,000.

Langley says that he told Johnston at the Bank that he wanted to borrow the $130,000 for investments and for the development of the Arizona and Mexico properties. But on December 13, 1965 he immediately by check paid an amount equalling the entire proceeds of the loan to Weber, Hall, the brokerage firm.

There is more evidence to which we might refer in support of our finding that the evidence is not sufficient to support the jury's answers to Special Issues Nos. 1 and 4, but we shall not further extend this opinion in that regard. The judgment in favor of the Bank will be and is hereby reversed and the cause as to Langley will be and is hereby remanded for another trial.

## IN RE WEBER, HALL'S APPEAL

■ In four points of error Weber, Hall asserts that the court erred in rendering judgment against Weber, Hall because (1) the jury's answer to Special Issue No. 8 was supported by substantial evidence, (2) there was no evidence that Weber, Hall's letter of December 13, 1965 was designedly written to influence the Bank in loaning $130,000 to Langley, (3) the letter as a matter of law created no obligation from Weber, Hall to the Bank; and (4) it was error for the court not to grant judgment over against Langley, if Weber, Hall was liable to the Bank.

We have concluded that Weber, Hall's first three points of error should be sustained.

Newell C. Johnston, a vice-president of the Bank, handled most of the negotiations with Langley. Johnston testified that Langley himself on the afternoon of December 13, 1965 brought the letter from Weber, Hall and delivered it to him at the Bank, and that he relied on the letter.

But Johnston's testimony above referred to is far from conclusive. He himself testified that he did not have authority to bind the Bank for loans in excess of $50,000. He had to obtain the temporary approval of Senior Vice-President Ernest Senft, then obtain the final approval of the Senior Loan Committee for loans in excess of $50,000. He did so in this case. Johnston testified that Senft asked him to get a letter from Weber, Hall, but Senft approved the loan after examining a "scratch sheet" prepared by Johnston. Ernest Senft did not testify. This "scratch sheet" made no mention of the letter from Weber, Hall. We quote from Johnston's testimony:

"Q After he reviewed this scratch sheet, did he give you immediate approval?

A Yes, sir.

Q And naturally, I asume, you would have no way of knowing why he approved the loan or what went through his mind when he approved it?

A No, sir.

\* \* \* \* \* \*

Q Now, the next loan you have testified was on December 13?

A That is right.

Q Did you have any conversation with Mr. Les Stewart prior to making that loan?

A No, sir, I did not.

Q Did you have any conversation with anyone at Weber, Hall, Cobb & Caudle, Inc. prior to making that loan?

A No, sir.

Q  Did you know any person at Weber, Hall, Cobb & Caudle, Inc. prior to making that loan?

A  I did not.

Q  So prior to making the loan of December 13, you had one conversation with Les Stewart?

A  That is right.

Q  And that concerned Regulation U?

A  Yes, sir.

Q  Which is a bank Federal Reserve Regulation?

A  True."

The Loan Committee's Memorandum approving the loan makes no mention of the letter from Weber, Hall. The part of the Memorandum material here is as follows:

"WILLIAM J. LANGLEY, M.D.  ·  $130,000.00  12–20–65
* * *  The note will be drawn for 30 days and will be paid on or before maturity from the sale of stock. The total indebtedness of Dr. Langley after these two advances will be $288,472.77. A financial statement of Dr. Langley dated April 30, 1965 shows total Assets $1,509,166.00, total Liabilities $168,000.00 and Net Worth of $1,341,166.00.  Approved."

———◆———

Leslie L. Stewart testified that he dictated the letter at the request of Langley. He signed it after it was typed. He did not deliver it to Langley. He did not dispatch it to the Bank and does not know whether it was delivered to the Bank. He told a secretary to mail it. He did not recall Langley ever coming by the office to pick up documents. The first time he ever talked to Johnston, the Bank's vice-president, was on January 31, 1966. He did not know on December 13, 1965 that Langley owed the Bank $130,000.

Mrs. Jan Slocum, then a secretary at Weber, Hall, testified that Leslie Stewart dictated the letter. She typed it. Stewart signed the letter and handed it back to her. She then put it in an unstamped envelope and placed it in her outgoing mail box. Langley did not come by to pick it up. She believes she would have seen him if he had come by, for she sat right "in the front door."

Henry Marcus, mail clerk for Weber, Hall, testified as to the procedure for mailing letters. His duty was to go around the office picking up letters in the outgoing mail boxes, running the letters "through the machine", and then sending them. He didn't remember ever seeing Langley before the date of the trial. He wouldn't allow anybody to come by and pick up a letter without permission of an officer of the company.

Langley testified that he didn't remember whether he asked Leslie Stewart of Weber, Hall to write the letter of December 13, 1965. Neither did he remember taking the letter to the Bank. However he earlier testified to the contrary in bankruptcy court. We quote his testimony:

"Q  Back in your hearing, in the bankruptcy court, that was back January 5th of 1967; Doctor, would your memory have been better back then?

A  Yes, sir, it certainly would have been.

Q  They questioned this letter, this particular letter right here, they asked you this question—one of the bank's attorneys, this man's firm—'You at this time deny that you hand-carried that letter down to the bank when you closed the loan,' talking about the $130,000.00 loan. Your answer was, 'No, sir, I'm essentially positive I didn't hand-carry any of those letters.' Next question was, 'Do you deny that you hand-carried that?' 'Yes, sir, to the best of my recollection.' So

that was your testimony at that time. Would you say that your recollection was better then than it is now as to—

A Very definitely.

\* \* \* \* \* \*

Q That was your testimony at that time; is that correct?

A Yes, sir."

The record includes a letter from Langley to the Bank dated December 13, 1965, introduced in evidence by the Bank itself, from which it may well be inferred that the Bank did not expect to receive the shares of stock of Collins Radio and Trans-World Airlines on December 13, 1965, the date of the $130,000 loan. We copy Langley's letter:

"Dallas, Texas
12-13-65

Texas Bank & Trust Company
of Dallas:

In consideration of your making a loan to me on this date as evidenced by my promissory note in the amount of $130,-000.00 delivered to you herewith, I agree to deliver to you on 1–13–66 the following securities to be held by you as collateral for such loans:

1,000 S/S T.W.A.
1,900 S/S Collins Radio

If I fail to deliver such securities to you within such time, I hereby agree that you may, at your option, declare the above described note due and payable.

Very truly yours,

W. J. Langley"

The above agreement is corroborated by Johnston, the Bank vice-president who carried on negotiations with Langley. We quote from his testimony:

"Q Thirty days. So that he had 30 days to deliver those securities to you?

A Right.

Q Is that correct?

A Right."

There is no other evidence in the record tending to support our opinion that there was sufficient evidence to support the jury's answer to Special Issue No. 8. We sustain Weber, Hall's first three points of error.

We think judgment should have been rendered in favor of Weber, Hall on the jury verdict. Therefore we reverse the judgment against Weber, Hall and hereby render judgment that the Bank take nothing against Weber, Hall.

Reversed and remanded in part, and reversed and rendered in part.