**HOME STATE BANK and Thomas T. Smith, Trustee, Appellants,**

v.

**W. R. CAVETT, Appellee.**

**No. 12174.**

Court of Civil Appeals of Texas, Austin.

Jan. 29, 1975.

R. Harry Akin, Pearce, Smith & Akin, Austin, for appellants.

John D. Wooddell, Fowler, Fowler & Wooddell, Austin, for appellee.

O'QUINN, Justice.

W. R. Cavett brought this suit against Home State Bank of Marble Falls, as holder, and Thomas T. Smith, as trustee, of a deed of trust, seeking to have the deed of trust declared invalid and to remove cloud from Cavett's title to the real property described in the deed.

The principal basis for the lawsuit was that the deed of trust " . . . is invalid and void because the indebtedness it purported to secure did not exist as [at] the time of the execution . . . or at any time thereafter, causing a failure of consideration for said Deed of Trust."

Trial was before the court without intervention of a jury, and the court entered judgment declaring the deed of trust void and removing cloud on the chain of title of the property described in the deed.

Home State Bank and the trustee have appealed and bring six points of error. We will overrule the points of error considered and will affirm judgment of the trial court.

The events which finally led to involvement of Cavett, the appellee, in this controversy with Home State Bank of Marble Falls, began late in December of 1968, when F. R. Gentry, who had borrowed money from the bank on prior occasions, applied to the bank for a loan of $35,000. Gentry offered, as collateral for the loan, 700 shares of stock of Dreyfus Mutual Funds, which he had on hand, and 1,000 shares of stock of Dreyfus Corporation, which Gentry represented that he had ordered and would deliver as collateral after he received the stock, which would be in about six weeks.

It appears undisputed that at that time the Dreyfus Mutual stock was worth about $16 per share, and that the Dreyfus Corporation stock was worth approximately $41 or $42 per share. Thus, as collateral, the stocks would have represented a total worth of between $52,200 and $53,200 to secure the loan of $35,000. The bank's president, Hubert J. Schnelle, told Gentry that the bank would require more than a verbal guaranty of delivery of the Dreyfus Corporation stock, and Gentry offered "to get a letter of guarantee from the stock broker." The bank's loan committee subsequently approved Gentry's application for the loan, subject to "a letter of guarantee from the broker."

Between the time Gentry applied for the loan and the date the loan was made, which was on January 10, 1969, Gentry approached Cavett, who is Gentry's brother-in-law, and asked Cavett to write a letter for him. Gentry dictated the letter while Cavett typed it on stationery of W. R. Cavett & Company, identified as a member of National Association of Security Dealers, Inc., and as dealer in securities and mutual funds. The letter as typed and signed is set out in full:

"December 26, 1968

Home State Bank
Marble Falls,
Texas.

Attention Mr. Hubert J. Schnelle

Gentlemen:

We guarantee delivery to you, in due course of

1,000 Shares of Dreyfus Corporation for the account of Mr. F. R. Gentry, of Council Creek.

Sincerely yours

W. R. CAVETT & COMPANY
/s/ W. R. Cavett
W. R. Cavett"

Gentry did not indicate to Cavett the purpose for which he intended to use the letter. Cavett testified that he could only speculate as to its purpose and did not know whether its purpose was to obtain a loan, cover an overdraft, or "to pay for stock in the bank." Cavett had been in the brokerage business a limited time, about 18 months, but in that period Cavett had handled some $235,000 worth of "stock deals" for Gentry, "all paid for except two, one cancelled, and one at the end he couldn't pay for." Gentry had shown Cavett a financial statement which indicated Gentry owned in excess of 1,000 shares of Dreyfus Corporation.

The bank made the first loan, for $35,000, to Gentry on January 10, 1969, and twenty-four days later renewed and enlarged the loan to $67,000, on February 3. It was not until after Gentry had defaulted on the second loan, due 30 days after February 3, that Cavett learned that the bank had made any loan to Gentry. Two bank officials, Schnelle, the president, and Walter R. Giesecke, chairman of the board and head of the loan committee, testified at the trial of this cause that they relied on the letter from Cavett in making both loans to Gentry.

The trial court filed findings of fact and conclusions of law and found contrary to the testimony of the two bank officers. The court found that, "Home State Bank did not rely on any representation by Cavett when it made loans to F. R. Gentry."

■■ Findings of a trial court will be sustained on appeal if there is any evidence to support them when the record shows, as in this case, that specific findings and conclusions of law were filed and a statement of facts is also brought forward. 4 McDonald, Texas Civil Practice, sec. 16.10(b), p. 29 (1971). In a non-jury case, the trial court's findings of fact have the force and effect of a jury verdict, and the findings will not be disturbed if supported by any evidence of probative force.

Guerrero v. Paredes, 470 S.W.2d 921, 923 (Tex.Civ.App. El Paso 1971, no writ).

■ In determining whether there is in the record evidence of probative value to support findings of fact, the appellate court must examine the evidence and view it most favorably to the findings and draw all reasonable conclusions from the evidence. In viewing the evidence and drawing the reasonable inferences, if the reviewing court concludes that a reasonable mind could reach the conclusion reached by the trial court, then there exists evidence of probative force. The appellate court will review the correctness of the legal conclusions drawn from the facts found, but may not disregard a finding and render judgment contrary to it if evidence of probative force supports the finding. 1 McDonald, *supra;* Tix v. Employers Casualty Company, 368 S.W.2d 105, 107 (Tex.Civ. App. Houston 1963, no writ); Coastal Plains, Inc. v. City of Fort Worth, 443 S. W.2d 414, 418 (Tex.Civ.App. Fort Worth 1969, no writ); Arnold v. Caprielian, 437 S.W.2d 620, 625 (Tex.Civ.App. Tyler 1969, writ ref. n.r.e.).

In examining the evidence, as it bears upon the finding that the bank did not rely on Cavett's letter in making the loans to Gentry, it is at once apparent that neither Schnelle nor Giesecke, the two bank officers who made the loans, fully understood or correctly recalled the contents of Cavett's letter. Schnelle believed that the shares of Dreyfus Corporation were to be delivered in six weeks "as stated in the letter," whereas the letter simply stated "in due course," and it was Gentry who told Schnelle that delivery would be in six weeks. Giesecke believed that Cavett had signed a security agreement and was liable on the note, a belief not reasonably drawn from the words of the letter which made no reference to a loan or any other obligation.

Both Schnelle and Giesecke testified they considered Cavett's role that of a

stockbroker, although neither man knew or had ever heard of Cavett, and neither made any attempt to verify Cavett's existence or his signature on the letter, or to ascertain from Cavett whether Gentry had ordered the stock. Cavett was never advised by Schnelle or Giesecke that either loan was being, or had been, made, and they made no attempt to reach Cavette until after Gentry had defaulted on the second note. Giesecke testified that the phrase "delivery . . . in due course," as used in Cavett's letter, meant ". . . that the documents have to be furnished, signed, mailed, paid for, delivered," and both bankers appear to have understood delivery normally could not be expected in less than six weeks.

Giesecke testified that he understood delivery of stock, after an order is placed, usually takes "forty-five to sixty days," and that delivery could be delayed "Sometimes as late as ninety days . . ." The note of February 3 was due March 5, and from Giesecke's testimony it is apparent that when that loan was made the bank did not expect delivery of the stock until later, perhaps, if delivery took ninety days, not until after the second note would mature on March 5. Gentry had suggested to the bank that he obtain a letter from a stockbroker; Gentry obtained the letter from Cavett and delivered it himself to the bank; Gentry represented that he had ordered the stock, and the bank expected Gentry, not Cavett, to deliver the stock. All the bank's dealings were with Gentry and it had none with Cavett, save the letter Gentry took to the bank, until after Gentry had defaulted on the loan.

Prior to the transactions out of which this lawsuit developed, Gentry had obtained loans from the bank, and through these transactions Schnelle, the president, had come to trust Gentry. From the evidence it is clear that Gentry, not Cavett, represented to the bank that Gentry had ordered the stock for delivery as collateral on the loan of January 10. Schnelle, when asked whether he believed Gentry, testified, "I took his word for it." The bankers admitted that ordinarily loans were not made by the bank, with stock as collateral, until the stock was actually delivered to the bank and an assignment executed by the borrower, the only exception being ". . . where someone like Merrill-Lynch, for example, delivered a commitment letter of delivery." But, as already observed, neither banker knew Cavett, or his reputation, which would be somewhat less extensive than that of Merrill-Lynch, operating on a national scale.

When the second loan was made, on February 3, the bank accepted additional collateral from Gentry in the form of a security agreement on 603 head of cattle, consisting of 300 Registered Polled Hereford cows, with 300 calves, and three Registered Polled Hereford bulls, which Gentry represented he owned "on the B. N. Crouch Ranch eight miles from West Columbia in Brazoria County, Texas." Again the bank took Gentry's word, this time that he owned the pledged cattle, and made no attempt to verify existence of the cattle or the ranch where they might be inspected. Later the bank learned, after Gentry defaulted, that the Registered Polled Herefords and the calves were only mythical beasts, grazing in the fertile pastures of Gentry's imagination.

After Gentry defaulted, the bank brought suit on the note and obtained a summary judgment. In support of the bank's motion for summary judgment, Schnelle made an affidavit in which no mention was made, and no claim asserted, as to the 1,000 shares of Dreyfus Corporation stock, on the theory that Cavett's letter was a guarantee of delivery, although other collateral was accounted for.

After it became apparent to the bank that Gentry probably had defaulted, and efforts to find him failed, the bank turned to Cavett for the first time, and, following several weeks of visits and conferences, Cavett was induced to execute a deed of trust on his home in Austin, the instrument

which by this suit Cavett sought to have set aside as void. The trial court found that, "The Defendants put undue pressure and exerted undue influence on Cavett to sign the Deed of Trust," and made other findings relating to the nature and extent of such pressure and undue influence. Since we conclude that the judgment of the trial court may be affirmed on other grounds, we do not reach the issues raised under these findings, and will not review the evidence to determine whether the findings are supported.

■ We conclude that there was evidence of probative force to support the finding of the trial court that the bank did not rely on any representation by Cavett when the bank made loans to Gentry. Since the bank did not make the loans in reliance on Cavett's letter, in which he acted as a broker, that letter as a matter of law created no obligation from Cavett to the bank. The bank does not contend, and there is no evidence tending to show, that Cavett's letter was designedly written to induce the bank to make the loans to Gentry. Clear and reasonable inferences from the evidence are that the bank did not expect to receive the Dreyfus Corporation stock before, or at the time, either loan was made to Gentry, and that in fact when the second loan was made the bank was aware of the possibility that it would not receive the stock before the loan would mature thirty days later.

In a case in which the facts are strikingly similar to the facts of this lawsuit the Dallas Court of Civil Appeals held there was sufficient evidence to support a jury finding that the bank, in making a loan to a borrower, did not rely on a letter supplied by a broker promising to deliver certain stock belonging to the borrower, and rendered judgment that the bank take nothing in its suit against the broker. Langley v. Texas Bank and Trust Company, 454 S.W.2d 815 (Tex.Civ.App. Dallas 1970, writ ref. n.r.e.).

We affirm the trial court's conclusion and judgment that the bank's actions did not constitute reliance and therefore by law no obligation was created.

The deed of trust signed by Cavett provided that the instrument was in trust "to secure the full payment of the following indebtedness: Any and all obligations of the Grantor herein due to Home State Bank . . . intending hereby to secure all such obligations whether direct or as a surety or as a guarantor and not only for debts and obligations existing at this time but any and all debts and obligations created in the future; provided, however, said obligations are to be paid and discharged on or before one year from date."

■ The trial court found that Cavett did not receive any benefit for signing the deed of trust and concluded that there was no consideration to support the deed.

The bank contends on appeal that consideration for the deed of trust consisted of the obligation to be drawn from Cavett's letter and in the bank's forbearance to sue Cavett. We have already held that the letter did not create an obligation from Cavett to the bank. The trustee on the deed of trust, an attorney who handled the transaction, testified he did not promise Cavett that the bank would forbear suit. There is no affirmative evidence the bank did agree or promise to forbear. It is also evident from the record that the bank did not offer not to harm Cavett in a hearing at which his license was revoked. The bank's attorney testified against Cavett at that hearing. The deed of trust contains no recitation of forbearance of any nature.

The record contains evidence of probative force to support the trial court's finding that there was no consideration for the deed of trust, and we have discovered no evidence in the record to the contrary.

The judgment of the trial court is affirmed.